**Dale B. GOUGER & Carol Ann Gouger**

**v.**

**BEAR, STEARNS & CO., INC. & Ronald Diamond.**

**Civ. A. No. 92–7455.**

United States District Court, E.D. Pennsylvania.

May 24, 1993.

Joseph P. Green, Jr., Duffy & Green, West Chester, PA, for plaintiffs.

Francine Friedman Griesing, Jay A. Dubow, Wolf, Block, Schorr and Solis-Cohen, Philadelphia, PA, for defendants.

## MEMORANDUM

CAHN, Chief Judge.

The plaintiffs, Dale B. Gouger and Carol Ann Gouger ["the Gougers"], initiated this suit against defendants Bear, Stearns & Co., Inc. ["Bear, Stearns"] and Ronald Diamond ["Diamond"]. Bear, Stearns is a registered securities broker-dealer and Diamond is one of its licensed brokers. The Gougers, who had opened an account at Bear, Stearns, claim that they sustained losses as a result of its improvident and excessive investments. The defendants have filed a motion to compel arbitration in accordance with Section 4 of the Federal Arbitration Act ["FAA"], 9 U.S.C. § 4, and the customer agreements that the parties executed. The Gougers, however, contend that the motion should be denied because the arbitration agreement was procured by fraud. After a review of the parties' briefs and consideration of the arguments made by their attorneys at the hearing held on May 14, 1993, this court concludes that the defendants' motion will be granted.

## I) BACKGROUND

The facts, insofar as they relate to the motion to compel arbitration, are undisputed. At Diamond's behest, Dale Gouger, a doctor who specializes in psychiatry, opened an account with Bear, Stearns in 1991. As part of that process, Dr. Gouger was required to execute a Customer Agreement. Approximately one year later he converted his account to a joint account with his wife, Carol. At that time, the Gougers signed another Customer Agreement. Both agreements specify that any disputes between the parties will be resolved through arbitration. Specifically, the clause states in pertinent part that

> *ARBITRATION.* ... You agree and by maintaining an account for you Bear, Stearns agrees that controversies arising between you and Bear, Stearns concerning your accounts or this or any other agreement between you and Bear, Stearns whether entered into prior to, or subsequent to the date hereof, shall be determined by arbitration. Any arbitration under this agreement shall be held under the rules and auspices of the New York Stock Exchange, Inc., the American Stock Exchange, Inc. or the National Association of Securities Dealers, Inc. ...: The award of the arbitrators or of the majority of them shall be final and judgment upon the award rendered may be entered in any court, state or federal, having jurisdiction.

The Customer Agreements also contain, separate from the arbitration clause, a choice of law provision. Specifically, it states that

> *New York Law to Govern.* This agreement shall be deemed to have been made in the State of New York and shall be construed, and the rights and liabilities of the parties determined in accordance with the law of the State of New York.

Neither Diamond nor any other employee of Bear, Stearns explained to the Gougers the effect of these clauses. The Gougers invested a substantial sum of money into a personal account and an individual retirement account ["IRA"] at Bear, Stearns.[1] The Gougers contend that they suffered losses of approximately $180,000.00 and paid $200,000.00 in commissions to the defendants because the defendants churned[2] their account and made unsuitable investments. Despite the existence of the arbitration clause, the plaintiffs filed suit in this court. They seek *inter alia,* compensatory damages, punitive damages, attorneys fees, and costs. The defendants' Motion to Compel ensued.

## II) DISCUSSION

The Gougers urge that arbitration should not be compelled because the Customer Agreements that they executed were induced by misrepresentation and fraudulent non-disclosure. Specifically, they allege that Bear, Stearns did not explain the legal effect of the arbitration clause and the choice of law provision in the Customer Agreements. The "legal effect" that they refer to is that under New York law, arbitrators may not award punitive damages. *See Garrity v. Lyle Stuart, Inc.,* 40 N.Y.2d 354, 386 N.Y.S.2d 831, 832, 353 N.E.2d 793, 794 (1976) (cited in *Barbier v. Shearson Lehman Hutton, Inc.,* 948 F.2d 117, 121, 122 (2d Cir.1991); *Fahnestock & Co. v. Waltman,* 935 F.2d 512, 517–518 (2d Cir.1991) (*cert. denied,* —— U.S. ——, 112 S.Ct. 380, 116 L.Ed.2d 331 (1991)).

As a threshold matter, it must be determined whether the FAA governs the dispute in this case. The FAA does not cover all agreements to arbitrate. A federal district court must compel arbitration pursuant to 9 U.S.C. § 4 "only when [it] would have jurisdiction over a suit on the underlying dispute; hence, there must be diversity of citizenship or some other independent basis for federal jurisdiction before the order can issue." *Moses H. Cone Memorial Hospital v. Mercury Construction Corp.,* 460

---

1. Between February of 1991 and April of 1992, it is alleged that the Gougers invested $72,375.00 into their personal account, and $383,978.42 into their IRA.

2. "Churning occurs 'when a broker, exercising control over the volume and frequency of trading, abuses his customer's confidence for personal gain by initiating transactions that are excessive in view of the character of the account.'" *Leib v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 461 F.Supp. 951, 952 (E.D.Mich.1978) (quoting *Carras v. Burns,* 516 F.2d 251, 258 (4th Cir.1975)).

U.S. 1, 25 n. 32, 103 S.Ct. 927, 942 n. 32, 74 L.Ed.2d 765 (1983)). In this case, the court has subject matter jurisdiction because some of the claims are predicated on § 27 of the Securities Act of 1934, codified at 15 U.S.C. § 78aa. *See* 28 U.S.C. § 1331. Moreover, the parties are completely diverse, and the amount in controversy exceeds $50,000. *See* 28 U.S.C. § 1332. Accordingly, federal law must be used to determine whether the agreement to arbitrate shall be enforced. *See Three Valleys Municipal Water District v. E.F. Hutton,* 925 F.2d 1136, 1139 (9th Cir.1991) (citing *Moses H. Cone Memorial Hospital,* 460 U.S. at 24, 103 S.Ct. at 941). Indeed, both parties agree that the FAA is controlling.[3]

■ Section 2 of the FAA, codified at 9 U.S.C. § 2 specifies that arbitration clauses in cases such as this "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." Furthermore, the "[Arbitration] Act leaves no place for discretion by a district court, but instead mandates that district courts *shall* direct the parties to proceed to arbitration on issues as to which an arbitration agreement has been signed." *Dean Witter Reynolds Inc. v. Byrd,* 470 U.S. 213, 218, 105 S.Ct. 1238, 1241, 84 L.Ed.2d 158 (1985) (emphasis in the original) (construing 9 U.S.C. §§ 3, 4). Accordingly, unless the Gougers demonstrate that the arbitration agreement is unenforceable, this matter must be stayed and the parties must proceed to arbitration.

■ It is well-settled that a party to an agreement may avoid enforcement of an arbitration clause if it can be shown that the agreement to arbitrate was procured by fraud in the inducement. *Mitsubishi Motors v. Soler Chrysler–Plymouth,* 473 U.S. 614, 627, 105 S.Ct. 3346, 3354, 87 L.Ed.2d 444 (1985); *Southland Corp. v. Keating,* 465 U.S. 1, 16 n. 11, 104 S.Ct. 852, 861 n. 11, 79 L.Ed.2d 1 (1984). If, however, the claim of fraud in the inducement pertains to the con-

tract generally, the court is unable to adjudicate it. *See Prima Paint Corp. v. Flood & Conklin Manufacturing Co.,* 388 U.S. 395, 404, 87 S.Ct. 1801, 1806, 18 L.Ed.2d 1270 (U.S.1967) ("a federal court may consider *only* issues relating to the making and performance of the agreement to arbitrate") (emphasis added). Limiting the court's scrutiny of fraud in the inducement claims to the agreement to arbitrate helps further the federal policy of favoring arbitration. *Mercury Construction,* 460 U.S. at 24, 103 S.Ct. at 941. Additionally, such a policy does not leave the party seeking to avoid arbitration without an opportunity to resolve its fraud claims. The more general claims of fraud in the inducement must simply be resolved by the arbitrators. *Mercury Construction,* 460 U.S. at 24, 103 S.Ct. at 941 (citing *Prima Paint,* 388 U.S. at 402–404, 87 S.Ct. at 1805–1806).

In this case, the Gougers do not exclusively attack the arbitration clause. Instead, they consider the arbitration clause and the choice of law clause to be inextricably intertwined. *See* Plaintiff's Memorandum in Opposition to Defendant's Motion to Compel at p. 6 (stating that the "arbitration agreement was induced by fraudulent non-disclosure as to the purpose and legal effect of the combination of the arbitration clause and the New York choice of law provision"). They, therefore, assert that the court, rather than the arbitrators, should resolve the issue.

This court is constrained to disagree. A closer examination of the Gougers' argument reveals that the two issues are in fact separable. The thrust of the Gougers' argument is not that they will be forced to arbitrate their claims; their primary objection is that they, assuming their claims are substantiated, will be unable to procure punitive damages. It is true that the reason the Gougers may be unable to recoup punitive damages is due to New York case law that limits the power of

---

**3.** In *Shearson/American Express, Inc. v. McMahon,* 482 U.S. 220, 107 S.Ct. 2332, 96 L.Ed.2d 185 (1987), the Supreme Court observed a court need not apply the Arbitration Act provided that the party who opposed its application could demonstrate that "Congress intended to preclude a

waiver of judicial remedies for the statutory rights at issue." *McMahon,* 482 U.S. at 227, 107 S.Ct. at 2337. The Gougers make no such argument in this case; rather, they contend that application of the Act to their claims does not warrant that the case be arbitrated.

arbitrators.[4] Nevertheless, it does not automatically follow that because New York law precludes arbitrators from awarding punitive damages, that the selection of New York law in the contract implicates the agreement to arbitrate. Indeed, the arbitrators may ultimately conclude that the choice of law selection is invalid or that punitive damages may be awarded despite the presence of the choice of law provision. *See Bonar, supra.*

Since this court concludes that the two issues are distinct, the issue of whether Bear, Stearns fraudulently misrepresented the effect of the New York choice of law provision may be resolved by the arbitrators. Such a conclusion is entirely consistent with the Supreme Court's interpretation of the FAA. In *Byrd,* the Court observed that "the preeminent concern of Congress in passing the [FAA] was to enforce private agreements into which parties had entered," and that the Court should "rigorously enforce agreements to arbitrate." *Byrd,* 470 U.S. at 221, 105 S.Ct. at 1242 (cited with approval in *McMahon,* 482 U.S. at 226, 107 S.Ct. at 2337). In *Mercury Construction,* the Court held that "*any* doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration." *Mercury Construction,* 460 U.S. at 24–25, 103 S.Ct. at 941 (emphasis added) (cited with approval in *McMahon,* 482 U.S. at 226, 107 S.Ct. at 2337). Since this court must scrupulously observe its duty to compel arbitration in the absence of a flaw in the agreement to arbitrate, the defendant's motion must be granted.

■ This court's conclusion would be the same even assuming, *arguendo,* that the arbitration clause in the agreement and the choice of law provision were not severable. The Gougers contend that Bear, Stearns owed them a fiduciary duty, and that Bear,

Stearns breached that duty because it did not explain the "effect" of those provisions. The fiduciary obligation that the Gougers rely upon is contained in § 173 of the Restatement (Second) of Contracts (1979). Section 173 provides that

> [i]f a fiduciary makes a contract with his beneficiary relating to matters within the scope of the fiduciary relation, the contract is voidable by the beneficiary, unless
>
> (a) it is on fair terms, and
>
> (b) all parties beneficially interested manifest assent with full understanding of their legal rights and of all relevant facts that the fiduciary knows or should know.

Under both Pennsylvania and New York law, it is beyond peradventure that fiduciary obligations flow from the securities broker to the customer. *See Merrill Lynch, Pierce, Fenner & Smith v. Perelle,* 356 Pa.Super. 165, 514 A.2d 552, 560 (1986); *Jaksich v. Thomson McKinnon Securities, Inc.,* 582 F.Supp. 485, 502 (S.D.N.Y.1984). Nevertheless, it is equally clear that these fiduciary obligations are circumscribed. *See, e.g., Perelle,* 514 A.2d at 560 (finding that "the broker is subject to *certain* fiduciary obligations to his client") (emphasis added). Indeed, the very language in § 173 limits the duty of the securities broker "to matters within the scope of the fiduciary relation." Accordingly, resolution of the Gougers' claim turns on whether an explanation of the choice of law provision is within the scope of Bear, Stearns' fiduciary relationship with them.

A review of the cases that discuss the breadth of a securities broker's fiduciary obligation to the customer leads to the inescapable conclusion that the broker's duty does not require an explanation of the choice of law provision and the agreement to arbitrate. In *Perelle,* the customer alleged, *inter alia,*

---

**4.** The court notes that there is a circuit split regarding the characterization of the law that prohibits an award of punitive damages by arbitrators. For instance, the Second Circuit Court of Appeals characterizes it as a matter of state substantive law, and thus, the law is applicable to the parties by virtue of the choice of law provision in their customer agreement. *Barbier,* 948 F.2d at 122. On the other hand, the Ninth Circuit Court of Appeals has determined that the ability of arbitrators to award punitive damages is a matter of arbitration law rather than state substantive law, and thus is governed by the FAA irrespective of the choice of law provision in the contract. *Todd Shipyards Corp. v. Cunard Line, Ltd.,* 943 F.2d 1056, 1062 (9th Cir.1991). *Accord Bonar v. Dean Witter Reynolds, Inc.,* 835 F.2d 1378, 1387 (11th Cir.1988) ("the choice of law provision does not deprive the arbitrators of their power to award punitive damages"). The Third Circuit Court of Appeals has not yet addressed this issue. Therefore, it is conceivable that the Gougers could receive punitive damages despite the choice of law provision.

that the broker failed to inform him that he could ask for an extension of time to meet a margin call.[5] The court concluded that unless there existed unusual circumstances, brokers were not required to inform margin customers that time extensions to meet margin calls were feasible. *Perelle*, 514 A.2d at 562. In *Schenck*, the court held that "before a fiduciary duty applies, it must be shown that the information in question was relevant to affairs entrusted to the broker. The scope of affairs entrusted to a broker is generally limited to the completion of a transaction." *Schenck*, 484 F.Supp. at 947. In *Robinson v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 337 F.Supp. 107 (N.D.Ala.1971), *aff'd* 453 F.2d 417 (5th Cir.1972), the broker failed to disclose certain market information to the customer. The court concluded that the relationship between the broker and the customer existed only "when an order to buy or sell was placed, and terminated when the transaction was complete." *Robinson*, 337 F.Supp. at 111.

■■■ This court recognizes that in the case at bar, it is alleged that the account with Bear, Stearns was a de facto discretionary account, rather than a non-discretionary one.[6] Assuming this to be to true, Bear Stearns' duty to the Gougers is heightened. *See Leib v. Merrill Lynch, Pierce, Fenner & Smith*, 461 F.Supp. 951, 952–54 (E.D.Mich. 1978) (distinguishing the duties owed by a broker who handles a discretionary account as opposed to a non-discretionary or hybrid-type account). Nevertheless, it is clear that this duty does not extend to explaining a choice of law provision contained in the customer agreement. The Second Circuit Court of Appeals commented on the obligation that a dealer owes to a buyer in *Hanly v. Securities and Exchange Commission*, 415 F.2d 589 (2d Cir.1969). Specifically, the court noted that "[a] securities dealer occupies a special relationship to a buyer of securities in

that by his position he implicitly represents that he has an adequate basis for the opinions he renders." *Hanly*, 415 F.2d at 596. In *Leib*, the court enumerated a variety of duties that a broker who manages a discretionary account has.

> Such a broker ... must (1) manage the account in a manner directly comporting with the needs and objectives of the customer as stated in the authorization papers or as apparent from the customer's investment and trading history. *Rolf v. Blyth Eastman Dillon & Co., Inc.*, 570 F.2d 38 (2d Cir.1978); (2) keep informed regarding the changes in the market which affect his customer's interest and act responsively to protect those interests (see in this regard *Robinson v. Merrill Lynch, supra*); (3) keep his customer informed as to each completed transaction; and (5) [sic] explain the practical impact and potential risks of the course of dealing in which the broker is engaged, *Stevens v. Abbott, Proctor and Paine*, 288 F.Supp. 836 (E.D.Va. 1968).

*Leib*, 461 F.Supp. at 953.

The foregoing establishes that the broker handling a discretionary account has an unequivocal fiduciary duty to the customer with respect to the broker's investment activities and to any facet of their relationship that pertains to the customer's money. The plaintiffs have not cited, nor has the court found, a single case that requires a broker, who knew or should have known that a choice of law provision in a customer agreement proscribed punitive damages in arbitrations, to explain that to its customers. Furthermore, strong policy reasons militate against the imposition of a rule that requires brokers to explain the effect of a choice of law provision to their customers. The inability of arbitrators to award punitive damages is only one aspect of New York law that is

---

**5.** For an explanation of margin accounts, *see Perelle*, 514 A.2d at 553 n. 1 (citing *Jablon v. Dean Witter & Co.*, 614 F.2d 677, 682 n. 10 (9th Cir.1980); *Schenck v. Bear, Stearns & Co.*, 484 F.Supp. 937, 939 (S.D.N.Y.1979)).

**6.** In a discretionary account the broker can manage the customer's account without obtaining the approval of the customer for each transaction.

*Leib v. Merrill Lynch, Pierce, Fenner & Smith*, 461 F.Supp. 951, 953 (E.D.Mich.1978). By contrast, in a non-discretionary account the customer makes the final decision regarding the purchases and sales made by the broker. *Leib*, 461 F.Supp. at 952. In *Perelle, Schenck*, and *Robinson, supra*, the nature of the account between the customer and the broker was non-discretionary.

potentially implicated by a choice of law provision. Thus, if such a rule was imposed, a broker-dealer would have to spend days, maybe weeks, explaining the various nuances of New York law to every potential customer before an agreement could be executed. As the court aptly stated in *Robinson, supra,* such a requirement "would be so burdensome as to be unreasonable, and neither logic, reason nor common sense would impose such a ... duty." [7] *Robinson,* 337 F.Supp. at 113. Moreover, a customer could void his entire customer agreement and emerge victorious in a lawsuit by simply establishing that his securities broker failed to explain the effect of **any** applicable state law. It would be untenable to hold brokers to such a standard. The broker has a high degree of expertise regarding the investment and management of a discretionary account; the broker's knowledge of the law is not as vast. Accordingly, the failure of Bear, Stearns to explain the consequences of the arbitration clause in conjunction with the choice of law provision does not amount to a breach of its fiduciary duty to the Gougers.

### III) CONCLUSION

For the foregoing reasons, this court will grant the defendants' Motion to Compel Arbitration. An appropriate Order follows.

### ORDER

AND NOW, this 24th day of May, 1993, upon consideration of the defendants' Motion to Compel Arbitration and for the reasons set forth in the accompanying Memorandum, IT IS ORDERED that the defendants' Motion is GRANTED. This action is STAYED and the plaintiffs are ORDERED to submit their claims to arbitration in accordance with the terms of the Customer Agreements with the defendants.

---

7. The court in *Robinson* was referring to a failure by a broker to disclose some fact to the customer rather than a failure to disclose the effect of a law. Nevertheless, this court finds the two situations to be analogous.